United States District Court
For the Northern District of California

1

2

3

4

5              IN THE UNITED STATES DISTRICT COURT

6            FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8   JACQUELINE ALFORD,                    No. 09-01306 CW

9           Plaintiff,                    ORDER GRANTING IN
                                          PART AND DENYING
10      v.                                IN PART
                                          DEFENDANTS' MOTION
11  HUMBOLDT COUNTY; GARY PHILP; CITY     FOR SUMMARY
    OF EUREKA; CHIEF GARR NIELSEN;        JUDGMENT
12  DEPUTY GREG BERRY; LIEUTENANT         (Docket No. 35)
    GEORGE CAVINTA; SERGEANT WILLIAM
13  NOVA; SERGEANT BRYAN QUENELL;
    DEPUTY JAMIE BARNEY; LIEUTENANT
14  DAVE MOREY; and DETECTIVE RICH
    SCHLESIGER,
15
            Defendants.
16  _____/

17

18      Plaintiff Jacqueline Alford brings this lawsuit individually

19  and as an heir and successor in interest to her son Peter Stewart

20  who died in a fire on the afternoon of June 4, 2007, after a

21  protracted standoff with law enforcement.  Defendants have moved

22  for summary judgment on all of Ms. Alford's claims.  Ms. Alford

23  has agreed to dismiss her third, fourth and fifth causes of

24  action, which allege conspiracies and municipal liability.  Pl.'s

25  Opp. to Defs.' Mot. Summ. J. at 23.  The third, fourth and fifth

26  causes of action are dismissed, and thus no claims remain against

27

28

Humboldt County, the City of Eureka or Rich Schlesiger.[1]  Ms. Alford opposes partial summary judgment on her first and second causes of action under 42 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendments.  The matter was heard on November 18, 2010.  Having considered oral argument and the parties' submissions, the Court grants Defendants' motion in part and denies it in part.

BACKGROUND

Multiple law enforcement agencies and officers were involved in the events at the center of this lawsuit.  Ms. Alford has named several, but not all, as Defendants.  Humboldt County Sheriff's Department (HCSD) Deputy Greg Berry and Yurok Tribal Police Department (YTPD) Officer Heather Landreneaux responded to the initial call for assistance, and made the first contact with Mr. Stewart.  The deputy and officer called for backup from the Hoopa Tribal Police Department (HTPD).  As the confrontation escalated to a standoff, HCSD sought assistance from the SWAT teams of the Eureka Police Department (EPD) and the California Department of Corrections, now the California Department of Corrections and Rehabilitation (CDCR), at Pelican Bay.  From the HCSD, Ms. Alford has named as Defendants: Sheriff Gary Philp, Lieutenant George Cavinta, Sergeant Bryan Quenell, Deputy Jamie Barney, Deputy Greg Berry, and Detective Rich Schlesiger.  From the EPD, Ms. Alford has sued Police Chief Garr Nielsen and SWAT Team Commander Sergeant William Nova.  Ms. Alford also named Lt. David Morey, but

---

[1] Schlesiger appears to be named only as part of the alleged conspiracies.  There is no evidence connecting him with any of the remaining claims.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  it is not clear of which law enforcement agency he is a member.

2  Neither the law enforcement agencies nor officers from the YTPD,

3  HTPD or the CDCR at Pelican Bay have been named as Defendants.

4      For purposes of this motion, the events leading up to the

5  police standoff and Mr. Stewart's death begin with his arrival at

6  the home of Mathew Moore and Debra Brown on the morning of June 3,

7  2007.  Both Mr. Moore and Ms. Brown had known Mr. Stewart since

8  childhood, but had not seen him in four or five years.  Mr.

9  Stewart arrived at their home on Bald Hill Road[2] in an agitated

10 state, wearing a wetsuit top and long coat on a warm summer day.

11 He entered the home unannounced.  Mr. Moore was feeling sick that

12 day, so he was lying in bed when Mr. Stewart arrived.  Mr. Stewart

13 climbed into the bed where Mr. Moore was sleeping.  Mr. Stewart

14 was speaking delusionally and appeared dehydrated.  Mr. Moore

15 thought that Mr. Stewart might be at the end of a methamphetamine

16 high.

17      Mr. Stewart's erratic behavior disturbed the family, so much

18 so that Ms. Brown called Mr. Stewart's mother, Ms. Alford, for

19 help.  After Mr. Stewart spoke about a violent dream and hurting a

20 child, and it became clear that he was carrying a knife, Ms. Brown

21 fled the home with her nine year old son and her nephew.  Mr.

22 Moore stayed behind with Mr. Stewart.

23      Mr. Stewart told Mr. Moore that he had slit a person's throat

24 and he felt evil.  Because Mr. Stewart did not appear bloody,

25 Mr. Moore did not believe him.  At one point, Mr. Stewart took to

26 ───────────────

27      [2] Mr. Moore refers to his home address as Hostler Ranch on
   Bald Hill, while other witnesses refer to the area as Bloody Camp

28 Road.

speaking into a medical device that Mr. Moore used for his sleep apnea, attempting to communicate with people who did not exist. Mr. Stewart insisted that he did not want to return to the county mental hospital, Sempervirens, where he was previously committed. Mr. Stewart asked Mr. Moore for guns, but Mr. Moore refused to provide him with any.  Mr. Stewart said that he did not want to be around anymore, and he would not be taken back to Sempervirens alive.  Mr. Moore tried to calm Mr. Stewart down, and with time was able to convince him to sit down for a sandwich and a drink.

After speaking with Ms. Brown, Ms. Alford immediately called a dispatcher for assistance.  Ms. Alford feared that her son had stopped taking his medication.  She specifically requested an ambulance instead of law enforcement to avoid scaring Mr. Stewart and escalating the situation.  Ms. Alford requested that Officer Mike Roberts of the HTPD respond to the scene in the event that an ambulance was unavailable.  Officer Roberts was familiar with Mr. Stewart and his mental illness, and Ms. Alford believed that Mr. Stewart trusted him.  Officer Roberts was unavailable, so Deputy Berry and Officer Landreneaux responded to the request for a welfare check.  Both officers drove to the scene in Officer Landreneux's vehicle.

The Moore-Brown residence was located in a very remote area in the mountains where the HTPD and HCSD often shared jurisdiction.  As Deputy Berry and Officer Landreneaux approached the driveway, they made contact with Ms. Brown who was driving in the opposite direction.  The officers and Ms. Brown pulled their cars over to talk.  Officer Landreneaux spoke with Ms. Brown for

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  about twenty minutes, and Deputy Berry spoke with Ms. Alford using

2  Ms. Brown's cell phone.

3      The officers proceeded up the mountain, arriving at the

4  residence at about 3:00 pm.  The home was a green trailer, and

5  further up the road there was another trailer residence.  There is

6  a dispute as to the manner in which the officers drove onto the

7  property.  Mr. Moore insists that the officers drove up the

8  driveway at a high rate of speed.  According to Mr. Moore, the

9  officers' arrival frightened Mr. Stewart who had gained some

10 measure of calm for a moment.

11     The officers parked about thirty feet in front of the

12 trailer, exited the vehicle, and began walking towards the

13 residence.  At this point Mr. Moore was standing on the ground in

14 front of the trailer, and Mr. Stewart stood at the top of the

15 stairs leading to the front door.  The officers told Mr. Stewart

16 that his mother was worried about him, and he needed to go with

17 them.  The officers assured Mr. Stewart that everything would be

18 okay, and they would not harm him.  Mr. Stewart responded by

19 pulling out what appeared to be two butter knives, and screaming,

20 "Welcome to the Dragon, motherfuckers!" a line inspired by an old

21 Bruce Lee movie.  Mr. Stewart was very angry about the officers'

22 presence, and demanded that they leave.  The officers drew their

23 weapons, and demanded that Mr. Stewart put down the knives.

24 According to Mr. Moore, Deputy Berry screamed back at Mr. Stewart,

25 "I'm about an inch from killing you."

26     Mr. Stewart put the knives in his waistband, went into the

27 house and shut the door.  Inside the house, Mr. Stewart found Mr.

28 Moore's .22 rifle and pointed it at the officers from just inside

**United States District Court**
For the Northern District of California

the window.  Mr. Moore warned the officers, and they sought cover behind their vehicle.  After a few moments, Mr. Stewart reappeared at the door, brandishing the rifle, repeatedly "dry-fired" the weapon, and then returned inside the house.  Deputy Berry backed the vehicle further away from the house in an attempt to gain a safer distance.  The officers called for backup.  Mr. Stewart repeatedly came out of the house to point and dry-fire the rifle at the officers.

Mr. Moore told the officers that he had other weapons and ammunition in the house, locked in a gun safe.  The weapons reportedly in the safe were an AR-15, an AK 27, a 12-gauge shotgun, a .45-caliber pistol, and possibly another .22 rifle. Mr. Moore said that the ammunition for the .22 rifle was not locked up, but was kept separate from the rifle, so Mr. Stewart would need to look for it.  The officers feared that Mr. Stewart would find the rifle bullets and gain access to the other weapons and ammunition.  At one point, Mr. Stewart reappeared with the rifle and what appeared to be a pistol.  Mr. Moore said that it was probably a toy, because he did not own any pistols.  Mr. Stewart continued to point the weapons at the officers, and pretended to fire at them.  No shots discharged.

About forty-five minutes after Deputy Berry and Officer Landreneaux requested assistance, other officers arrived: Mike Roberts, Willie Hostler, and Ed Guyer of the HTPD.  Officer Guyer told Deputy Berry that he had seen Mr. Stewart inside the house on a phone attempting to make calls.  Mr. Moore's landline did not work at the time.

Lt. Cavinta arrived at the scene at about 6:30 pm.  Shortly after arriving, Lt. Cavinta had a brief conversation with Ms. Alford, and with Mr. Stewart's father, Richard.[3]  Mr. Stewart's parents provided additional information about his mental health history.  It is not clear from her declaration exactly when, but Ms. Alford arrived at the scene sometime in the afternoon, and remained throughout the night, and throughout the time of the fire that killed her son.  Ms. Alford repeatedly offered to speak with Mr. Stewart in an attempt to calm him down and coax him out of the house, but her offers were rejected.  She urged HCSD officials to give Mr. Stewart his medication, and to throw him a telephone. Her requests were not heeded.

The HCSD had a SET team, the equivalent of a SWAT team.  The team was sent to the Moore-Brown home to provide assistance. According to Officer Landreneaux, the SET team arrived at about 8:30 pm.  Lt. Cavinta served as commander of the HCSD SET team, and as the overall incident commander.  Negotiators from the Humboldt County Mental Health Department arrived at the scene and were briefed on the situation.

Ms. Alford reported being at the scene during most of the standoff and never hearing any shots.  However, officers reported two sets of gunshots fired in the time period between about 6:30 pm and 8:30 or 9:00 pm.  Deputy Berry reported hearing four shots at about 6:30 pm, which apparently hit two police cars.  Deputy Barney reported a second set of shots when Mr. Stewart shot at him

---

[3] Mr. Stewart's father's last name is not mentioned in the record.

United States District Court
For the Northern District of California

and he returned fire at about 8:30 pm or 9:00 pm.  Officer
Landreneaux and Deputy Berry heard the shots as they were leaving
the scene, but did not witness them.  Lt. Cavinta testified to
hearing gunshots shortly after he arrived at 6:30 pm, while he was
speaking with Ms. Alford, and then again at about 9:00 pm.  No
bullet fragments were ever recovered, so there is no scientific
evidence confirming gunshots or who fired weapons.

Overall, there is little information in the record detailing
what happened during the night and morning hours prior to the
fire.  At about 2:25 am, EPD Sgt. Nova arrived at the scene.  He
served as commander of the EPD SWAT team.  His team consisted of
eight members, including two crisis negotiators, Sergeant Howden
and Officer Wilson.  Officers Timothy Jones and Louis Altic were
the EPD's chemical grenadiers.  Officer Jones arrived at about
3:00 am.  Officer Jones reported seeing a television on through
the window of the Moore-Brown residence.

The EPD maintained its presence from then through the time
when the fire consumed the residence, except for its two crisis
negotiators who were released from the scene in the morning.  The
HCSD had its own negotiators who relieved the EPD negotiators.
Sgt. Nova testified that his negotiators did not speak or
negotiate with Mr. Stewart because he and Lt. Cavinta jointly
decided that, given the time of night and darkness, it was too
risky to negotiate Mr. Stewart's surrender.

Other officers made several attempts to contact Mr. Stewart
over an intercom, but Mr. Stewart did not respond.  No
negotiations took place between law enforcement and Mr. Stewart.
Negotiators from the Humboldt County Mental Health Department were

present at the scene, and had been briefed.  According to Lt.
Cavinta, the HCSD's command of the incident included two
components, a tactical component, which he directed, and a
negotiation component, directed by Lt. Knight.  However, Lt.
Cavinta's testimony indicates that he exercised control that
encompassed the negotiators at the scene.  He ordered the Mental
Health Department negotiators to repeat orders to Mr. Stewart to
surrender.  Lt. Cavinta testified that no negotiations occurred
because Mr. Stewart never engaged in any dialogue.

Eventually, the HCSD and EPD deployed chemical agents into
the residence.  According to Ms. Alford, she heard the first tear
gas launch at about 11:00 am.  Over the course of several hours,
tear gas, in the form of CS 37 millimeter canisters, was launched
into the home.[4]  There is little precise information about exactly
how much tear gas was fired into the home.  Ms. Alford stated in
her declaration that she counted thirty-nine launches of tear gas
canisters.

After the CS 37 millimeter tear gas canisters failed to expel
Mr. Stewart, Lt. Cavinta directed Deputy Barney to throw
additional chemical agents into the home.  Id. at 20:16-18; Barney
Dep. at 25:4-17.  Lt. Cavinta made the decisions and issued
directives as to the use of chemical agents.  Lt. Cavinta
testified that, from the HCSD, only Deputies Barney and Taylor
were authorized to deploy chemical agents into the home.  Cavinta

_____

[4] The parties provide little explanation of the various
chemical agents deployed during this incident, including their
definitions and characteristics, although EPD Sgt. Nova testified
that tear gas is a common term for CS.  Nova Dep. at 17:25-18:3.

United States District Court
For the Northern District of California

Dep. at 1-8.  When asked what specific directions he gave to Deputy Barney, Lt. Cavinta responded, "They were to deploy two cannisters [sic] -- one in window A and one in window B.  Both cannisters [sic] were to be non pyrotechnic, OC or CS or CN, chemical agents."  Cavinta Dep. at 20:19-23.  Lt. Cavinta denied instructing Deputy Barney to launch a "triple-chamber CS grenade" into the home.  Id. at 24:25-25:2.

At the time of the incident, Deputy Barney had been a member of the SET team for four months.  He testified that the chain of command provided that Lt. Cavinta issued his orders to Sgt. Quenell who then relayed the commands to himself and Deputy Taylor.  Barney Dep. at 21:3-14.  Deputy Barney testified that Sgt. Quenell spoke with him and Deputy Taylor about "avoiding using any" pyrotechnics in the house.  Other than this, he did not have any other discussion about the use of chemical agents.  Id. at 23:7-12.

Deputies Barney and Taylor approached the trailer with a bullet-resistant blanket.  Cavinta Dep. at 31:14-16.  Deputy Barney came within two to three feet of the home and hand deployed one or two "aerosol OC grenades," a "stinger grenade" and two "triple chamber grenades" into window B.  Barney Dep. at 24:1-7, 26:24-28:3.  Deputy Barney discharged the aerosol OC grenades first, and then thirty minutes later discharged, in a matter of seconds, the stinger grenade and triple chamber grenades.  Id. at 26:24-27:24.  Deputy Barney testified that the grenades were more effective than the earlier deployed CS 37 millimeter canisters because they produced more tear gas and smoke.  Id. at 25:9-10.

United States District Court
For the Northern District of California

1    Within ten minutes after Deputy Barney discharged the final

2  grenades, smoke began escaping the house, but Mr. Stewart did not

3  emerge.  Although the exact time the fire ignited is not clear in

4  the record, it appears that it started at about 3:00 pm.

5    Deputy Barney also referred to the "triple chamber grenade"

6  as a "CS triple chamber grenade."  Id. at 26:8-12.  He testified

7  that a "triple chamber grenade" is "a nonpyrotechnic grenade that

8  is safe to be used indoors.  It dispenses gas and CS chemical."

9  Id. at 24:15-18.  He was aware at that time that HCSD's policy

10  directed the use of pyrotechnic devices for outdoor crowd control.

11  Id. at 17:2-7.  EPD Officer Altic, however, stated that, based on

12  his training as a chemical grenadier, he considered a "tri-chamber

13  smoke grenade" a pyrotechnic device.  Altic Dep. at 31:7-15.

14    The Hoopa Tribal Volunteer Fire Department had arrived at the

15  scene at about 8:00 or 9:00 am and stayed through the time the

16  fire began and consumed the trailer.  The department brought a

17  recently purchased fire truck.  Lt. Cavinta reported a

18  conversation with Hoopa Tribal Fire Chief Duane Sherman.  Although

19  the evidence as to time is vague, it appears that this

20  conversation took place after the fire had already started.

21  During that conversation, Lt. Cavinta concluded that it was too

22  dangerous to send firefighters to stop the fire.  There was a

23  concern that ammunition was "cooking off."  The HCSD and EPD kept

24  the fire department at a distance.

25    Raven Sherman was the sole member of the department who

26  submitted a declaration in this action.  According to her, the new

27  fire truck was equipped with a "high technology striker cannon

28  which allows the Fire Department to deploy a high pressure water

11

flow to a burning structure while maintaining a safe distance from the dwelling that is on fire."

After the fire, Richie Marshall, one of Mr. Stewart's cousins, went to the scene to identify his body.  Mr. Stewart's body was lying next to a bathtub filled with water, and he was wrapped in wet sheets.  Marshall stated in his declaration that officers were taking pictures and celebrating.

LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56.  Celotex Corp v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1289 (9th Cir. 1987).  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

DISCUSSION

I. Section 1983 Claim based on the Fourth Amendment

Under the Fourth Amendment, a police seizure must be reasonable in order to survive the constitutional scrutiny

12

United States District Court
For the Northern District of California

implicated in a § 1983 claim.  <u>Graham v. Connor</u>, 490 U.S. 386, 395 (1989).  "Apprehension by deadly force is a seizure subject to the Fourth Amendment's reasonableness requirement."  <u>Wilkinson v. Torres</u>, 610 F.3d 546, 550 (9th Cir. 2010).

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  <u>Graham</u>, 490 U.S. at 396.  "Because such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom . . . summary judgment or judgment as a matter of law . . . should be granted sparingly."  <u>Drummond v. City of Anaheim</u>, 343 F.3d 1052, 1056 (9th Cir. 2003).  The proper application of this objective test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  <u>Graham</u>, 490 U.S. at 396 (citing <u>Tennessee v. Garner</u>, 471 U.S. 1, 8-9 (1985)).  The Fourth Amendment permits use of deadly force to apprehend a person where there is "probable cause to believe the suspect poses a threat of serious physical harm."  <u>Garner</u>, 471 U.S.at 11.

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. "In addition, the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." Wilkinson, 610 F.3d at 550. However, "where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under Graham, the reasonableness of the force employed." Deorle v. Rutherford, 272 F.3d 1272, 1283 (9th Cir. 2001).

Liability under § 1983 extends to those actors who were integral participants in a constitutional violation, even if they did not directly engage in unconstitutional conduct themselves. Boyd v. Benton Co., 374 F.3d 773, 780 (9th Cir. 2004). An officer who does not enter an apartment, but stands at the door, armed with a gun, while others conduct the search, can be a full and active participant in the search, and therefore subject to liability. Id. On the other hand, an officer who is standing on the sidewalk interviewing a witness, and does not participate in the unconstitutional search in any fashion, cannot be held liable. Hopkins v. Bonvicino, 573 F.3d 752, 769-70 (9th Cir. 2009).

14

United States District Court
For the Northern District of California

A. Fourth Amendment Claim Against Deputy Berry

Ms. Alford's claim against Deputy Berry alleges that he entered the property without sufficient cause and used excessive force by pointing his gun at Mr. Stewart when Mr. Stewart was "merely suffering from a psychiatric emergency and posed no threat to Berry or anyone else." Compl. ¶ 39.

Ms. Alford has failed to produce sufficient evidence demonstrating a triable dispute of fact as to whether Deputy Berry behaved unreasonably. The undisputed evidence indicates that Deputy Berry and Officer Landreneaux entered the Bald Hill Road property to conduct a welfare check. Furthermore, Ms. Alford does not have standing to complain of entry without cause onto the property, because the property did not belong to Mr. Stewart or Ms. Alford.[5] While Ms. Alford alleges and Mr. Moore attests that

---

[5] Defendants' challenge to Plaintiff's standing to assert these Fourth Amendment claims does not appear to dispute her standing to bring her son's Fourth Amendment claims generally. "[T]he general rule is that only the person whose Fourth Amendment rights were violated can sue to vindicate those rights." Moreland v. Las Vegas Met. Police Dept., 159 F.3d 365, 369 (1998). "In § 1983 actions, however, the survivors of an individual killed as a result of an officer's excessive use of force may assert a Fourth Amendment claim on that individual's behalf if the relevant state's law authorizes a survival action." Id. (citing 42 U.S.C. § 1988(a) and Smith v. City of Fontana, 818 F.2d 1411, 1416-17 (9th Cir. 1987), overruled on other grounds by Hodgers-Durgin v. de la Vina, 199 F.3d 1037 (9th Cir. 1999). California Code of Civil Procedure § 377.20 provides that "a cause of action for or against a person is not lost by reason of the person's death, but survives subject to the applicable limitations period." See also Cal. Civ. Proc. Code § 377.60 (authorizing causes of action to be brought by decedent's personal representative or any of a defined list of persons, including survivors by intestate succession.)

United States District Court
For the Northern District of California

the officers sped up the driveway at undue speed, even if true, this is not sufficient to sustain a claim for excessive force.

The Court next considers whether Deputy Berry used unreasonable force by aiming his gun at Mr. Stewart.  Once the officers arrived at the home, they attempted to persuade Mr. Stewart to come with them, because his mother was concerned about him.  Mr. Stewart responded by brandishing two butter knives, and screaming, "Welcome to the Dragon!" and an explicative at the officers.  He retrieved a rifle from the house, and began aiming and dry-firing it at the officers.  Mr. Moore himself chose not to re-enter the house to try to coax Mr. Stewart into surrender.  Mr. Stewart repeatedly returned inside the house, creating a genuine risk that he might find Mr. Moore's unsecured rifle ammunition. It was also within the realm of possibility that Mr. Stewart could gain access to the numerous other weapons that Mr. Moore had stored in his home.  While it is true that the trailer was located in an exceedingly remote area, with no neighbors or passersby in close proximity, the officers, Mr. Moore and Mr. Stewart himself were in imminent danger.  In the face of this danger, Deputy Berry behaved with restraint.  He pulled his weapon and aimed it at Mr. Stewart for self-protection and to emphasize the seriousness of his order to Mr. Stewart that he put down the weapons.  Deputy Berry never fired his gun during the many hours that he was at the scene.  Instead he backed up his vehicle to a safer distance from the home and called for assistance.

United States District Court
For the Northern District of California

1    There is no evidence apart from Mr. Moore's testimony that

2  Deputy Berry told Mr. Stewart, "I'm an inch from killing you

3  [expletive]."  Crediting Mr. Moore's testimony about Deputy

4  Berry's harsh words, such language did not amount to an

5  unreasonable use of force, in a moment when Mr. Stewart was

6  obviously unstable, had brandished knives, and may have had other

7  weapons at his disposal.  The language, if used, may have been

8  counterproductive in this delicate situation, but it did not

9  violate the Fourth Amendment.

10    It is undisputed that Deputy Berry left the Bald Hill

11 property at about 9:00 pm on June 3, 2007, and did not return

12 during the remaining time period at issue in this lawsuit.  Ms.

13 Alford has not presented any evidence that  Deputy Berry was an

14 integral participant in launching chemical agents into the Moore-

15 Brown residence, or in blocking medical and fire fighting aid to

16 Mr. Stewart.  Because Deputy Berry's conduct was clearly within

17 the bounds of the Fourth Amendment, the Court grants summary

18 judgment in his favor on the Fourth Amendment claim against him.

19    B. Fourth Amendment Claims Against Other Defendants

20    Ms. Alford's Fourth Amendment § 1983 claim also includes a

21 challenge to the other Defendants' use of chemical agents against

22 Mr. Stewart, as well as the decision to block the Hoopa Tribal

23 Fire Department from extinguishing the blaze that killed Mr.

24 Stewart.

17

1. Use of Chemical Agents

The Court applies the three factors identified in the reasonableness test established in Graham.  First, the severity of the crime at issue must be considered.  Here, initially no crime was committed.  Deputy Berry and Officer Landreneaux had been called to conduct a welfare check, anticipating a possible commitment under California Welfare and Institutions Code § 5150. However, Mr. Stewart also forced the Moore-Brown family from their home, and the family was unable to return during the course of the standoff.  Then he threatened the officers with weapons.  Thus, contrary to Ms. Alford's assertions, violations of law occurred and brought some urgency to apprehending Mr. Stewart.

Under the second factor in the Graham test, the Court must consider whether Mr. Stewart was attempting to flee or evade arrest.  Mr. Stewart was not attempting to flee.  However, he did continue to resist arrest by refusing to leave the Moore-Brown residence.  Mr. Stewart's ongoing resistance increased the need for the officers to use force.

The constitutionality of law enforcement's actions in this case depends most heavily on whether Mr. Stewart posed an immediate threat to the officers or others, and whether the officers' actions were a reasonable response to that threat. Bryan v. MacPherson, 630 F.3d 805, 826 (9th Cir. 2010) ("The most important factor under Graham is whether the suspect posed an immediate threat to the safety of the officers or others.").  Ms.

United States District Court
For the Northern District of California

Alford makes several arguments asserting that the officers' conduct was unreasonable considering the threat Mr. Stewart posed.

First, Ms. Alford argues that the duration of the standoff and the length of time that passed without any gunfire diminished the threat Mr. Stewart posed.  If Ms. Alford's testimony is credited over the officers' testimony, as it must be on summary judgment, no shots were ever fired.  However, even if Mr. Stewart fired a gun, he did so at about 6:30 pm and again at about 9:00 pm on June 3, 2007.  Fourteen hours passed between the last shot and the time when the SWAT teams began firing tear gas canisters into the home at about 11:00 am.  Eighteen hours passed between the last gunshot allegedly fired and when officers launched chemical grenades into the trailer.  There is evidence that Mr. Stewart, at some point, had turned on a television.

Courts may consider timing in assessing the reasonableness of police response to a perceived threat.  See, e.g., Estate of Smith v. Marasco, 318 F.3d 497, 516 (3rd Cir. 2003).  In that case, the decedent was a mentally unstable individual who was engaged in an ongoing feud with his neighbor and had lodged several complaints against local law enforcement.  Id. at 502.  Two officers responded to a complaint by the decedent's neighbor.  When the decedent did not respond the officers' door knocks or phone calls, and they came to believe based on a light shining through a window that he was directing a laser-sighted firearm at the officers, the situation evolved into a barricaded gunman scenario.  Id. at 502-

19

03.  The Third Circuit noted that six and a half hours passed

between the initial call to the police and the time the Special

Emergency Response Team began its "rock assault" on the decedent's

home, clearing the home with rocks, tear gas, and "flash bang"

devices.  Id. at 503, 517.  According to the Third Circuit, the

passage of more than six hours, with no recent use a weapon by the

decedent and the decedent's history of mental problems, rendered

the use of force unreasonable.  The court contrasted the case with

Sharrar v. Felsing, 128 F.3d 810 (3rd Cir. 1997), where only three

hours transpired between the victim's call to police and the SWAT

team assault.  Id. at 516-17.

     Nevertheless, here, even if the threat's imminence had

diminished, the threat of violence itself remained present and Mr.

Stewart continued to barricade himself in someone else's home.

The undisputed evidence is that Mr. Stewart aimed at least one

weapon at law enforcement, the rifle ammunition in the Moore-Brown

residence was accessible, and Mr. Stewart was a deeply disturbed

individual who was wracked with violent thoughts and appeared to

have lost touch with reality.  The passage of time increased Mr.

Stewart's opportunity to find the rifle ammunition which was not

in a safe, and to locate the other high-powered weapons and

ammunition, and figure out a way to unlock the safe they were in.

The fact that the television was turned on does not negate that

continuing danger.  Accordingly, the passage of time without any

gunfire does not establish that the officers unreasonably

initiated their use of chemical weapons to expel Mr. Stewart from the home.

Ms. Alford also argues that law enforcement in this case failed to consider less dangerous alternatives to a tear gas and chemical grenade assault.  In Headwaters Forest Defense v. County of Humboldt, the Ninth Circuit held that, where protestors did not present an immediate threat to the safety of others, law enforcement officers--and the district court in reviewing the reasonableness of their actions--were required to consider other available tactics, such as negotiations, to accomplish arrests. 240 F.3d 1185, 1204-05 (9th Cir. 2000), vacated on other grounds, 534 U.S. 801 (2001); see also, Boyd, 374 F.3d at 779.

Ms. Alford points to evidence that she was not permitted to communicate with her son, despite her numerous requests to do so and her presence throughout the standoff.  However, the decision not to allow Ms. Alford to speak directly with Mr. Stewart does not establish that Defendants unreasonably failed to consider that option.  Lt. Cavinta spoke with Ms. Alford and Mr. Stewart's father, and Ms. Alford was in communication with other officers. Ms. Alford has not produced evidence that the officers' decision not to adopt her proposed strategy, in itself, rendered their decision to use force unreasonable.

In addition, Ms. Alford argues that Defendants' failure to negotiate with her son indicates that they neglected to consider less dangerous alternatives.  There is evidence that various teams

of negotiators were brought to the scene, and officers made

attempts to communicate with Mr. Stewart by intercom.  Mr.

Stewart's refusal to respond blocked these officers' attempts to

negotiate.

However, Ms. Alford further argues that Defendants

unreasonably failed to deliver a "throw phone"[6] or other means of

communication to the trailer.  Unlike the intercom used by the

officers, a throw phone could have offered a means for Mr. Stewart

to communicate privately with the officers, and thus facilitated

negotiations.  Lt. Cavinta testified only that no attempts were

made to deploy a throw phone into the residence, but he did not

explain the reason for not taking that step.  Defendants argue

that, under the circumstances, it would have been too dangerous to

attempt to deliver a throw phone into the residence.  Yet it is

undisputed that Deputies Taylor and Barney approached within two

to three feet of the residence to launch chemical grenades into

the windows.  They did this under the cover of a bullet-resistant

blanket.  A jury could find unreasonable Lt. Cavinta's failure to

take similar steps to deliver a throw phone or other communication

device into the Moore-Brown residence before ordering the use of

force.

_____

[6] A "throw phone" is a phone encased in a box that also
contains an open microphone.  <u>Fisher v. City of San Jose</u>, 558 F.3d
1069, 1073 n.3 (9th Cir. 2009) (en banc).

Instead, there is evidence that next a substantial number of tear gas canisters were launched toward the residence  However, Ms. Alford has failed to present facts as to the specific danger posed by the tear gas.  Sgt. Nova testified that they began introducing the chemical agents with the intent to induce Mr. Stewart to surrender or begin negotiating with them.  Ms. Alford does not point to evidence raising a dispute of material fact allowing a reasonable jury to find that law enforcement officers acted unreasonably with respect to their use of the tear gas canisters.

Ms. Alford concedes that the heart of her case is her allegation that Deputy Barney intentionally deployed pyrotechnic chemical agents into the home where Mr. Stewart had barricaded himself, causing the fire that ultimately killed her son.  Ms. Alford relies on <u>Boyd</u>, in which the Ninth Circuit determined that "flash-bang" devices are "inherently dangerous," and held that the use of such devices is excessive "absent a strong governmental interest, careful consideration of alternatives and appropriate measures to reduce the risk of injury."  374 F.3d at 779.  It is not clear that the chemical grenades used in this case were "flash-bang" devices as described in <u>Boyd.</u>

Deputy Barney admitted to deploying two "triple chamber grenades."  Although he testified that the grenades were not pyrotechnic, EPD Officer Altic testified, under questioning by Ms. Alford's counsel, that "tri-chamber smoke grenades" are

23

pyrotechnic.  Officer Altic is a chemical grenadier, and he stated that his testimony was based on his training.  Defendants do not argue that the "triple chamber grenades" Deputy Barney testified to using were a non-pyrotechnic device different from a "tri-chamber smoke grenade," which Officer Altic stated is pyrotechnic. Instead Defendants argue that there is no dispute of fact that the "tri-chamber smoke grenades" used by the HCSD were not pyrotechnic.  They contend that Officer Altic was confused when he made the statement that "tri-chamber smoke grenades" were pyrotechnic.  However, the testimony cited by Defendants indicates that Officer Altic's confusion related to whether he and Ms. Alford's counsel were referring the same device when they were discussing "sting ball" grenades.

Defendants also argue that Officer Altic had no personal knowledge of the devices Deputy Barney actually used.  While this is true, Defendants concede, as noted above, that the HCSD used a "tri-chamber smoke grenade" during the incident.  Officer Altic's lack of personal knowledge about what Deputy Barney deployed does not negate his testimony that a "tri-chamber smoke grenade" is pyrotechnic.  Furthermore, there is ample evidence that, within minutes after Deputy Barney deployed the final grenades, a fire began to consume the home.  There is no evidence that Mr. Stewart started the fire.  Accordingly, Ms. Alford has raised a triable dispute of fact as to whether Deputy Barney launched a pyrotechnic device into the Moore-Brown residence, causing the fire that led

to Mr. Stewart's death.  If he did so by mistake, he would not be liable, but a jury could infer that he knew or should have known that the device was pyrotechnic.  However, there is no evidence that Lt. Cavinta ordered deployment of a triple chamber grenade, as opposed to a non-pyrotechnic device.  Nor is there evidence that any other Defendant ordered or participated in the deployment of a pyrotechnic device.  Accordingly, no other Defendant's conduct could be found unreasonable on this ground.

         2. Failure to Rescue

     Ms. Alford further alleges that Defendant members of the HCSD and EPD violated Mr. Stewart's Fourth and Fourteenth Amendment rights by prohibiting the Hoopa Fire Department from rescuing him after the fire began.  The case law cited by Ms. Alford provides that the Fourth Amendment and the Fourteenth Amendment due process clause require that officers take reasonable steps to secure necessary medical care for a detainee who has been injured while being apprehended.  Tatum v. City and County of San Francisco, 441 F.3d 1090, 1098-99 (9th Cir. 2006) (holding that an officer who called for an ambulance, but did not provide CPR, satisfied the Fourth Amendment's requirement for objectively reasonable post-arrest care); Maddox v. City of Los Angeles, 792 F.2d 1408, 1415 (9th Cir. 1986) (pre-Graham decision affirming jury instructions stating that due process requires "police officers to seek the necessary medical attention for a detainee when he or she has been

injured while being apprehended") (citing <u>Revere v. Massachusetts General Hosp.</u>, 463 U.S. 239, 244 (1983)).

However, none of these cases is applicable to the present action, where Mr. Stewart continued to resist arrest, threatened law enforcement with weapons, and barricaded himself in a home with potentially accessible firearms.  In <u>Tatum</u> and <u>Maddox</u> the injured individuals had been arrested, and the adequacy of care provided by the officers subsequent to the arrest was challenged. Although the circumstances in which Mr. Stewart died are tragic, these cases do not establish that Mr. Stewart was constitutionally entitled to have firefighters battle flames and rescue him where there was uncertainty and a risk that he might fire upon them.

Here, it is undisputed that the Hoopa Tribal Fire Department was called to the scene during the standoff.  Lt. Cavinta consulted with Fire Chief Duane Sherman when the fire started and determined that was unsafe for fire personnel to approach, given that Mr. Stewart was in possession of firearms.  Ms. Alford has failed to produce evidence sufficient for a jury to find that this decision was unreasonable.  Ms. Sherman's declaration does not create a material dispute of fact because it is not qualified expert testimony and there is no evidence that she was informed of the dangers that Mr. Stewart posed to the firefighters. Furthermore, Lt. Cavinta's testimony that it would be safe for fire personnel to approach the residence and put out the fire only after Mr. Stewart voluntarily left the home or it was destroyed is

not evidence of an unreasonable decision given Mr. Stewart's earlier threats, brandishing of a rifle, and the presence of ammunition and other chemical agents heating in the flames. Accordingly, summary judgment is warranted with respect to Lt. Cavinta's decision to restrain the Fire Department.

Defendants' motion for summary judgment as to Ms. Alford's Fourth Amendment claims is granted in favor of HCSD Sheriff Philp, Sgt. Quenell, HCSD Deputy Berry, EPD Chief Nielsen, EPD Sgt. Nova and Lt. Morey.  Summary judgment on Ms. Alford's Fourth Amendment claims against HCSD Lt. Cavinta and HCSD Deputy Barney is denied.

III. Section 1983 Claim based on the Fourteenth Amendment

Ms. Alford also asserts a cause of action for violation of her Fourth Amendment substantive due process right to be free from unwarranted interference with her familial relationship with her son.  Compl. at ¶46.  "This circuit has recognized that parents have a Fourteenth Amendment liberty interest in the companionship and society of their children."  <u>Wilkinson</u>, 610 F.3d at 554. Under the Fourteenth Amendment, "only official conduct that 'shocks the conscience' is cognizable as a due process violation." <u>Porter v. Osborn</u>, 546 F.3d 1131, 1137 (citing <u>Lewis</u>, 523 U.S. at 846).

Ms. Alford argues that Defendants used excessive force against her son and were deliberately indifferent to his medical needs. Because the Court earlier found that Deputy Berry's conduct was within the bounds of the Fourth Amendment, his conduct also fails

United States District Court
For the Northern District of California

1    to sustain a claim under the "shocks the conscience" standard

2    applicable to Fourteenth Amendment claims.  The same is true with

3    respect to Ms. Alford's challenge of the decision to prevent the

4    Hoopa Tribal firefighters from extinguishing the flames.  Because

5    the evidence is insufficient to support an inference that this

6    decision was unreasonable, it also fails to raise a dispute of

7    fact that it shocks the conscience.

8         Ms. Alford's sole Fourth Amendment claims that warrant a trial

9    are those related to Lt. Cavinta's failure to order the delivery

10   of a throw phone into the Moore-Brown residence before authorizing

11   the use of force, and Deputy Barney's launch of two triple chamber

12   smoke grenades into the home.  However, to survive Defendants'

13   motion for summary judgment on her Fourteenth Amendment claims,

14   Ms. Alford must point to evidence sufficient to support a finding

15   that these actions were taken due to "deliberate indifference" or

16   "with a purpose to harm unrelated to legitimate law enforcement

17   objectives."  Porter, 546 F.3d at 1137 (explaining that under

18   Lewis the shocks-the-conscience standard may be met by showing

19   that an officer has acted either with deliberate indifference or

20   with a purpose to harm).  Ms. Alford has produced no evidence upon

21   which a jury could find that Lt. Cavinta or Deputy Barney intended

22   to harm Mr. Stewart.  Porter, 546 F.3d at 1138 n.6 (discerning no

23   distinction between "purpose to harm" and "intent to harm").

24        On the other hand, the less onerous deliberate indifference

25   standard requires only that Ms. Alford produce evidence that Lt.

26

27

28

Cavinta and Deputy Barney "knowingly and unreasonably" disregarded a risk of serious injury. Ewolski v. City of Brunswick, 287 F.3d 492, 515 (6th Cir. 2002) (post-Lewis decision applying the deliberate indifference standard to review police conduct during a two-day standoff). The deliberate indifference standard applies where an officer has time and a practical opportunity to make deliberate decisions. Lewis, 523 U.S. at 851. With respect to Lt. Cavinta's decision not to deliver a throw phone before resorting to chemical weapons, Defendants argue that it was simply too dangerous to deploy the phone. Defendants do not argue that no phone was available or that Lt. Cavinta was unaware of such phone. However, Mr. Stewart showed no inclination to negotiate or otherwise peacefully engage with law enforcement. Various negotiators and mental health personnel had been brought to the scene. Numerous attempts were made to communicate and negotiate with Mr. Stewart. That Lt. Cavinta did not deploy a throw phone in this circumstance does not indicate a purposeful, knowing indifference that shocks the conscience.

Turning to Deputy Barney's conduct, Ms. Alford has raised a material dispute of fact as to whether his actions shocked the conscience. As explained earlier, there is evidence that Deputy Barney deployed what may have been a pyrotechnic device into the home contrary to existing orders and policy. A reasonable jury could find that the knowing or reckless use of such a device

**United States District Court**
For the Northern District of California

1  demonstrates an unreasonable disregard for Mr. Stewart's well-

2  being that shocks the conscience.

3       Accordingly, Ms. Alford has a triable claim for violation of

4  her Fourteenth Amendment rights solely based on evidence that

5  Deputy Barney deployed a pyrotechnic device into the home.

6  Defendants' motion for summary judgment as to Ms. Alford's

7  Fourteenth Amendment claims is granted in favor of HCSD Sheriff

8  Philp, HCSD Lt. Cavinta, HCSD Sgt. Quenell, HCSD Deputy Berry, EPD

9  Chief Nielsen, EPD Sgt. Nova and Lt. Morey.  Defendants' motion is

10 denied regard to Ms. Alford's Fourteenth Amendment claim against

11

12 HCSD Deputy Barney.

13 IV.  Qualified Immunity

14      Defendants seek protection under the doctrine of qualified

15 immunity.  Qualified immunity shields law enforcement officers not

16 only from liability, but from the burdens of litigation.  Under

17 the test established in Saucier v. Katz, qualified immunity does

18 not apply when, viewing the facts in the light most favorable to

19 the allegedly injured party, the officer's conduct violated a

20 constitutional right, and the constitutional right was clearly

21 established at the time the misconduct occurred.  533 U.S. 194,

22

23 201 (2001).  "Since a reasonably competent public official should

24 know the law governing his conduct," qualified immunity does not

25 apply when the relevant law is clearly established.  Harlow v.

26 Fitzgerald, 457 U.S. 800, 818-19 (1982).  "In the absence of

27 binding precedent, a court should look to whatever decisional law

28

United States District Court
For the Northern District of California

is available to ascertain whether the law is clearly established for qualified immunity purposes, including decisions of state courts, other circuits, and district courts." Drummond, 343 F.3d at 1060 (internal citations, quotation marks and alteration omitted). State actors must have fair notice of what the law requires.

There is sufficient evidence for a reasonable jury to find that Deputy Barney violated the constitution by deploying a pyrotechnic device into the home where Mr. Stewart had barricaded himself. At the time of the incident, in 2007, decisions such as Boyd, 374 F.3d at 779, and Estate of Smith, 318 F.3d at 516-17, gave Deputy Barney sufficient notice of the need for caution when using explosive devices and other aggressive tactics to subdue a mentally unstable individual who is resisting arrest. It was well established at the time of the standoff that, where no immediate threat to the safety of others exists, law enforcement officers are required to consider less intrusive tactics before using less-than-lethal devices to accomplish an arrest. Boyd, 374 F.3d at 779 (requiring a warning and consideration of alternatives before use of a less-than-lethal flash bang device); see also Headwaters Forest Defense, 240 F.3d at 1204.

On the other hand, no pre-existing authority established that it was unreasonable for law enforcement officers to fail to deploy a throw phone as part of their efforts to negotiate a peaceful end

**United States District Court**
For the Northern District of California

1   to a standoff.  Accordingly, Lt. Cavinta is entitled to qualified

2   immunity based on this sole surviving claim against him.

3                              CONCLUSION

4        The Court grants Defendants' motion for summary judgment on

5   Ms. Alford's Fourth Amendment claims in favor of HCSD Sheriff

6   Philp, HCSD Sgt. Quenell, HCSD Deputy Berry, EPD Chief Nielsen,

7   EPD Sgt. Nova and Lt. Morey.  The Court denies summary judgment on

8   Ms. Alford's Fourth Amendment claims against Deputy Barney.  The

9   Court finds that Ms. Alford has produced sufficient evidence to

10  raise a Fourth Amendment claim against Lt. Cavinta, but grants

11  summary judgment in his favor because he is entitled to qualified

12  immunity.

13       The Court grants summary judgment on Ms. Alford's Fourteenth

14  Amendment claims in favor of HCSD Sheriff Philp, HCSD Lt. Cavinta,

15  HCSD Sgt. Quenell, HCSD Deputy Berry, EPD Chief Nielsen, EPD Sgt.

16  Nova and Lt. Morey.  However, the Court denies summary judgment on

17  Ms. Alford's Fourteenth Amendment claim against HCSD Deputy

18  Barney.

19       The Court dismisses all of the claims against Humboldt

20  County, the City of Eureka, and HCSD Detective Schlesiger.

21       IT IS SO ORDERED.

22  Dated: 4/11/2011

23                              _____

24                              CLAUDIA WILKEN
                                United States District Judge